**William A. FRAZER, Plaintiff,**

v.

**KFC NATIONAL MANAGEMENT COMPANY, Heublein, Inc., d/b/a Heublein Food Service and Franchising Group, Defendant.**

Civ. A. No. 78–40–COL.

United States District Court,
M. D. Georgia,
Columbus Division.

May 23, 1980.

James E. Butler, Jr., Columbus, Ga., for plaintiff.

Michael J. McGraw, KFC Corp., Louisville, Ky., Charles K. Howard, Jr., Elarbee, Clark & Paul, Atlanta, Ga., Albert W. Stubbs, Hatcher, Stubbs, Land, Hollis & Rothschild, Columbus, Ga., for defendant.

OWENS, Chief Judge:

Congress "to promote employment of older persons based on their ability rather than age; [and] to prohibit arbitrary age discrimination in employment . . ." 29 U.S.C. § 621, enacted the Age Discrimination in Employment Act of 1967. That Act declares that "[i]t shall be unlawful for an employer—(1) . . . to *discharge or otherwise discriminate* against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . ." 29 U.S.C. § 623(a).

On March 16, 1978, plaintiff William A. Frazer filed his complaint in this court alleging that his employer KFC National Management Company, a subsidiary of Heublein, Inc., which managed company owned Kentucky Fried Chicken outlets, unlawfully terminated his some fourteen years of employment on or about October 15, 1977, on account of his then being 61 years of age. His defendant employer after filing responsive pleadings and engaging in extensive discovery filed its motion for partial summary-judgment in which it contends that the undisputed material facts show that the plaintiff was neither discharged nor discriminated against in any manner but instead voluntarily left because of his own unhappiness over being offered a one-step lower management position which entailed neither loss of pay nor benefits. The entire file of pleadings, answers to interrogatories, depositions, admissions, affidavits and exhibits having been carefully considered, this constitutes the court's ruling pursuant to Rule 56(c), Federal Rules of Civil Procedure. That rule states "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . . ."

The undisputed material facts show that William A. Frazer was born January 1, 1916, attended the public schools of Columbus, Georgia, and worked at various jobs in Columbus until he became employed by a Kentucky Fried Chicken franchise owner in December 1965 as supervisor of their four stores. During the next four years the franchise added twelve more stores. Davis Food Stores purchased eight of those stores in July 1969, and Mr. Frazer became a District Manager for Davis with responsibility for the eight purchased plus six other already owned stores. By August 1969, Mr. Frazer was manager for Davis of a district which included about thirty-five stores. At that time Davis Food Service merged with KFC National Management Company, and Mr. Frazer continued with the merged company as a District Manager.

KFC National Management Company is a subsidiary of Heublein, Inc. which manages some 800 Kentucky Fried Chicken outlets that are company owned and operated throughout the United States. Some 3,000 other Kentucky Fried Chicken outlets are operated by franchisees. Geographically the company divided its operations into four regions of which the southeastern United States was Region III. Within each region the area was divided into districts. Mr. Frazer was the District Manager for one of Region III's six districts, the South Geor-

gia-Tallahassee District. Mr. Frazer in 1977 was responsible for some 42[1] Kentucky Fried Chicken stores in his district which stretched up to Carrollton, over to Brunswick and down to Lake City, Florida. From his office in Columbus, Georgia, he kept in daily telephone contact directly or through his secretary with each store and periodically visited each store. Personnel under his supervision included area managers each of whom was responsible for an average of eight of his stores, managers of each store and store personnel. According to defendant he directly or indirectly supervised some 492 employees.

During the 1974–1977 period defendant KFC National Management Company engaged in a program of consolidating its districts and reducing its operating overhead. Interrogatory answers show that this reduced defendant's districts from a nationwide total of 43 in June 1974 to totals of 40 in June 1975, 33 in June 1976, 22 in May 1977, and 18 in May 1978. Each consolidation of course reduced the number of district managers and increased the geographical area each had to cover.

Region III since June 1976 had been supervised by Harold Dunford, a vice president of defendant company, whose office was in Atlanta. Mr. Dunford since 1967 had been a district manager and a regional director of two other regions. He had suc-

ceeded Regional Director Russell Kuhn who was offered, accepted and still holds the next lower position of district manager for the Miami/Orlando District. Mr. Dunford states that based upon his observations of Mr. Frazer's performance as a district manager, his conferences with Mr. Frazer in which Mr. Frazer's shortcomings were discussed and the prior concurrence of defendant company's president, he decided that it would be in the best interest of the company to replace Mr. Frazer as district manager by transferring Charles Farrell, a district manager whose Western Region district was being consolidated, to Region III and the South Georgia-Thomasville District. Mr. Farrell had worked from two franchisees for ten years and came with KFC from Davis Foods in 1973; he was Orlando district manager from August 1973 until he became the West Texas district manager in June 1976. He then had fourteen years of Kentucky Fried Chicken experience and was thirty-seven years of age.

On September 21, 1977, Mr. Frazer attended a district manager's meeting in Mr. Dunford's Atlanta office. Prior to that Mr. Frazer recalls that Mr. Dunford told him he was not building strength in his organization, that he had problems, Macon was continuing to decline and his district's repair and maintenance was continuing to suffer. Frazer deposition at 28.

1. Until the South Georgia-Tallahassee District was expended in the fall of 1977, it included 42 stores located as follows:

| Location | No. of Stores |
| --- | --- |
| Bainbridge, Georgia | 1 |
| Brunswick | 2 |
| Waycross | 1 |
| Vidalia | 1 |
| Albany | 3 |
| Americus | 1 |
| Cordele | 1 |
| Tifton | 1 |
| Valdosta | 1 |
| Moultrie | 1 |
| Thomasville | 1 |
| Columbus | 6 |
| LaGrange | 2 |
| Carrollton | 1 |
| Newnan | 1 |
| Macon | 2 |
| Milledgeville | 1 |
| Warner Robins | 1 |
| Perry | 2 |

| Location | No. of Stores |
| --- | --- |
| Forsyth | 1 |
| Douglas | 1 |
| Bremen | 1 |
| Swainsboro | 1 |
| Cairo | 1 |
| Lake City, Florida | 1 |
| Tallahassee | 4 |
| Phoenix City, Alabama | 1 |
| Auburn | 1 |

On September 30, 1976 the Vidalia store was refranchised and on March 31, 1977 the stores in Bainbridge, Americus and Douglas were refranchised.

In the Region III reorganization in the Fall of 1977 when the South Georgia/Tallahassee District was enlarged, the following stores were added to the Plaintiff's District:

| Location | No. of Stores |
| --- | --- |
| Charleston, S.C. | 6 |
| Savannah, Ga. | 3 |

According to Mr. Frazer's own deposition testimony, the following happened that day:

Q. Okay. You recall the September 22 meeting. What did Mr. Dunford tell you at that meeting?

A. We were told in the meeting with the district managers prior to going back in his office that he would see us one on one to give us our bonus for the previous quarter. I walked in his office. We chitchatted. He pulled out an evaluation form with a check attached. We looked over the evaluation, and he handed me the check. Then his next words were, "Bill, we are going to make a change in your district. We are going to bring some new blood in".

Q. What else, if anything, did he say to you?

A. Then he *offered me the job as an area manager.*

Q. Was that all?

A. Said he would call me.

Q. Go ahead and complete what he said.

A. He asked me to go home and sleep on it and said he would call me the next morning and talk to me about it.

Q. And he, in fact, did call you the next morning?

A. Right.

Q. All right, What did the offer of the area manager's job consist of? Do you recall that?

A. Well, the *duties of an area manager in whatever area I would have elected to take.*

Q. Did he discuss with you that you could *stay in Columbus* if you wished to do so?

A. Right, *he did.*

Q. Did he tell you that it would be *without loss of pay?*

A. *He did.*

Q. And *without loss of benefits?*

A. *He did.*

Q. Okay. Mr. Frazer, could you tell me why you did not accept that position?

A. Why I didn't accept it?

Q. Yes, sir.

A. Well, in the first place, I did not understand or could not understand why I was being demoted. It seemed to me that if I wasn't capable or had not been capable of running the district, then I really didn't see how Mr. Dunford could feel like I would be capable of running an area.

Q. Well, *did Mr. Dunford express his confidence to you that he was sure you could?*

A. *Yes, he did that.* (Plaintiff's deposition at 29–31).

    *     *     *     *     *     *

Q. Now, as I understand it, Mr. Frazer, you were *also offered an opportunity to consider buying a franchise or becoming a franchisee in the Thomasville store,* I believe—

A. *Right.*

Q. —during the meeting on September 21.

A. It either happened that day or the next day. I don't know. It could have been over the 'phone. I don't know.

Q. What was your response to that inquiry?

A. I wasn't interested in it.

Q. Do you recall being *offered a field service, district manager field service position* by the company?

A. *Yes.*

Q. By Mr. Bill Evans?

A. Yes.

Q. When did that occur?

A. The date I don't recall. Some time prior to October 15.

Q. Did that *offer also include* the fact that you could *stay in Columbus, continue living there?*

A. I believe *Mr. Evans made that remark* over the 'phone, but, of course, the territory would have been some distance from Columbus.

Q. Would it have also been a move without loss in pay and benefits?

A. I don't know. (*Id* at 34–35.) (Emphasis supplied).

\* \* \* \* \* \*

Q. All right. Let me go back over a few other things here.

You testified earlier that you had made no effort to look for other employment since your employment with KFC stopped. Why did you not look for other employment?

A. Well, maybe my frame of mind has something to do with it.

Q. In what way, please?

A. Well, put yourself in my position. You were the district manager for four years covering the whole time, and then out of a clear blue sky you walk into an office and a man tells you that he is going to make a change, although you have the impression that you are doing a good job. I felt that way about it, and it *was just like a slap in the face*, really for Mr. Dunford to stand there and tell me that. (*Id.* at 50–51). (Emphasis supplied).

Mr. Frazer identified two letters, Exhibits "A" and "B", received by him which confirmed these offers.

Mr. Frazer was asked about his failure to accept either of these offers and about his knowledge of fall-back positions having been offered to others:

Q. Mr. Frazer, *why did you turn down the district manager, field services, job?*

A. Well, *I didn't think I would like it for one thing* and *I didn't care for the possibly Sunday afternoon until Friday night away from home.*

Q. Did the job require a good deal of travel?

A. Would it require what?

Q. A good deal of travel?

A. That's all it would be, I suppose. That is the only thing I ever knew it to be.

Q. Do you recall having a conversation with Mrs. Gay Curtis in which she urged you to accept the offers being made by the company and asked you why you had not accepted them and you commented to her

that it was just a matter of personal pride and that you couldn't look at yourself in the mirror in the morning if you did it?

A. I possibly might have. I don't know.

Q. Was that a feeling that you had concerning these jobs that were offered to you?

A. No, not these jobs.

Q. Well, either one of them then? Maybe I stated the question too broadly. Would that have been the feeling concerning the area managers job?

A. More so than the others.

Q. More so than the others?

A. Yes, sir.

Q. Okay. Did anyone tell you not to accept these jobs, or was this a personal decision?

A. No, no one told me not to.

Q. With regard to the district manager, field services, job that you were offered, do you recall any discussion concerning whether or not the job would be without loss of pay or benefits?

A. No, sir. I talked with Bill Evans one day, and he called me back several days later for my decision, and there was no salary or anything discussed.

Q. All right. I hand you a copy of a letter dated October 21, 1977, from Harold Dunford addressed to you and ask you to look at that and see if you received a copy of that?

A. Yes, sir.

Q. Did you have, Mr. Frazer, any understanding of what company policy was with regard to the offer of fall-back positions to employees?

A. State the question again, please.

Q. Did you or do you have any understanding at all of what company policy and practice is with regard to offering employees fall-back positions or transfers?

A. Do I understand the company policy on it?

Q. Yes sir.

MR. BUTLER: I think he has already stated he didn't understand there was any

company policy for fall-back positions in answer to a previous question.

BY MR. HOWARD:

Q. You do know that that took place quite frequently then?

A. Well, I knew it had taken place in Dave Kuhn's case.

Q. In his situation and these others that we talked about earlier?

A. Yes.

Q. So you knew you weren't the only one in the company that either had been or was being asked to do something like that?

A. Well, I *didn't know of anybody else who had been demoted from their position to a fall-back position. I don't know of anybody else.*

Q. Well, what about Mr. Kuhn? He was regional manager and he was—

A. It was a reorganization that caused that, so we were told.

Q. What was the result? He still took a demotion.

A. Well, that's right.

Q. Have you ever been present in district managers' meetings where the Heublein fall-back philosophy was discussed?

A. Yes. In the reorganizing of the company the fall-back position was discussed, but when a person has been demoted, I don't know that I have ever had that explained or heard an explanation.

Q. Well, there was a reorganization that had recently taken place within your district, wasn't there?

A. I don't know. Who are you talking about?

Q. Well, they had just added the Charleston and Savannah stores to your district.

A. Well, that was a reorganizing of it doing away with the whole thing.

Q. I guess what I am asking is that the offer was being made to you in the context of when reorganization was taking place.

A. Well, personally I didn't feel like it was a reorganization.

Q. All right, so this was your personal feeling about it. Let me ask this then. When Mr. Kuhn was asked to take a fall-back position from regional manager to district manager, was anything reorganized in Region 3?

A. Yes.

Q. What was reorganized there?

A. Mr. Dunford came in as regional director. Mr. Kuhn went out as district manager. Chuck Farrell was transferred to Texas. It was a company wide reorganization.

Q. All right. Let me ask this. Now, the other fall-backs that we talked about earlier, were they part of any reorganization?

A. All that happened at the same time.

Q. I guess I am having difficulty understanding why you think your situation is different when you were asked to take a fall-back position than when Mr. Kuhn was asked to take a fall-back position and he was demoted according to your terminology. He went from a regional manager to a district manager within the same region he had previously supervised.

A. What is it you can't understand?

Q. I just don't understand the difference between that and what you were faced with. I just wanted you to try to explain it to me, at least what in your mind the difference was.

A. When Mr. Kuhn went back to a district manager, it was a companywide reorganization. There were some regions cut out, district managers cut out, area managers cut out, you know, some number of people. In my case it was not.

Q. Is it your testimony, then, that every time someone within the company has taken a fall-back position that it has been a part of a massive reorganization of the company?

A. No, sir, no.

Q. Are you aware of other district managers who have transferred to taken fall-back positions to district manager, field service, jobs?

A. I don't know. I am not familiar with it. I don't know how many times it happened. (Plaintiff's deposition at 36–41).

During the more than two years that this lawsuit has been in this court, Mr. Frazer has persisted in his contention that he thinks all of this transpired because of his almost 62 years of age but all that he has produced—affidavits, interrogatory answers, and depositions—pertains to what he has learned about other KFC employees and their differences with KFC, bears no casual connection to anything that happened to him and does not even circumstantially show that the offers made to him and refused by him resulted from a plan to get rid of persons between forty and sixty-five years of age.

■ Was Mr. Frazer discharged? The discharge that is proscribed by the Act is either an actual or constructive discharge. An actual discharge occurs when an employer fires, dismisses, releases, ousts, lets go, terminates, sacks, gets rid of, gives the gate to, cans, axes, bounces, or gives walking papers to an employee resulting in the severance of the entire employment relationship. On the other hand a constructive discharge occurs when the employer instead of severing the entire relationship with the employee, "deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. . . ." *Young v. Southwestern Savings and Loan Assn.*, 509 F.2d 140, 144 (5th Cir. 1975). In determining whether or not a constructive discharge occurred, the court determines whether or not a reasonable person in the employee's position and circumstances would have felt compelled to resign. *Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61 (5th Cir. 1980). As such the employee does not have to prove that it was the employer's purpose to force the employee to resign.

The undisputed facts first of all do not show that the plaintiff was discharged. As he himself said, he was offered the next lower job without loss of pay or benefits and also offered another job and the opportunity to go into business for himself as the owner of the Thomasville franchise. Given ample opportunity to consider each offer, he accepted none and departed the company's employment. His departure thus resulted not from actual discharge but from his failure to accept either a lesser job without loss of pay or benefits or the opportunity to become a franchisee.

■ Was Mr. Frazer constructively discharged? In considering this possibility it is important to remember that the Age Discrimination in Employment Act is not intended to prevent employers from changing the job responsibilities of their 40 to 65 year old employees. Neither is the Act intended to give 40 to 65 year old employees the right to walk out and sue their employer because they dislike their changed job responsibilities. If the employee walks out, he can complain of discharge only if the offered or altered " 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' *Alicea Rosada v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977)." *Bourque, supra,* at 119.

■ Mr. Frazer was in a management position with this company. Without loss of pay or benefits he was offered lesser management duties as an area manager of some eight stores in his own district and told that he could choose the area and would not have to move his residence. This, of course, would have been to some "a come down" and to others a retirement with full pay job. If looked upon as "a come down" and a daily embarrassment because of working at a lower level among those formerly supervised while at a higher level, a reasonable person would have considered the field service job which would have taken Mr. Frazer into a new geographical area and caused him to work with people who had not been under his supervi-

sion. The following interrogatory answer compares what his job was and would have been in each instance:

*Answer*:

(1) and (2): With regard to the muniments and responsibilities of Plaintiff's position as District Manager, compared to the fall-back positions he was offered:

|  | District Manager | Area Manager | District Manager Field Services |
|---|---|---|---|
| Salary | $24,600 annually | same | same |
| Bonus | See Plan attached as Exhibit No. 1 | See Plan attached as Exhibit No. 1 | none |
| Retirement | Please refer to booklet entitled "Your Lifetime Compensation" previously produced by Defendant. | same | same |
| Number of stores supervised | 40 | 8 (average) | 63 (7 franchisees) |
| Number of employees supervised (directly or indirectly) | 492 (average) | 88 (average) | none |
| Travel required | Territory in South Georgia/Tallahassee. Average time from office is at least 3 days or nights a week. | Depends upon area. | Territory is ⅔ of Alabama and 2 counties in Mississippi. Average time away from office is 2 to 3 days or nights a week. |
| Opportunity for advancement | Defendant does not know what is meant by the term "advancement" since it is not defined and can be meant to include a variety of elements, including career development, promotion, salary increase, grade change, job enlargement, etc. However, had the Plaintiff accepted the alternative positions offered him, the possibility existed for him to return to his former position of a District Manager and/or to advance to other positions within the system depending upon such factors as performance, future reorganization, realignments, restructuring of markets, or other business changes or developments. | | |

---

Under all of the circumstances disclosed by all the undisputed evidence, any reasonable person would have accepted the area manager job and enjoyed less responsibility while receiving the same pay and benefits he had been receiving or would have accepted either the other equally appealing job offer or franchise opportunity. While he may not have liked the offers, no reasonable person would have felt compelled to resign as the plaintiff did. The plaintiff was not constructively discharged; he departed voluntarily and of his own accord.

While the plaintiff has not claimed that he was "otherwise discriminated against," the court has kept that possibility in mind in considering this motion and has found no evidence of such discrimination.

The undisputed facts having shown that the plaintiff was neither actually nor constructively discharged by his defendant employer, the plaintiff as a matter of law has no claim against the defendant under the Age Discrimination in Employment Act and the defendant is entitled to judgment. Defendant's motion for summary judgment is GRANTED.

SO ORDERED.

## EXHIBIT A

KFC National Management Company
3300 Northeast Expressway
P.O. Box 100093,
Atlanta, Georgia 30348
(404) 451 8781

October 21, 1977
Mr. William A. Frazer
3137 West Britt David Road

Columbus, GA 31904

Dear Bill:

This is beginning to sound repetitious of our past conversations concerning the change in your position with the Company, but I did not want to close the book on this without giving you every opportunity to consider the benefits of remaining with us. You've been paid through October, so I will hold the Area Manager position open until the end of the month.

As I've explained to you, considering the recent expansion in the area covered by the South Georgia District and the corresponding increased responsibilities, as well as the increasing "numbers" problems we are experiencing in your District, I feel the Area Manager's position in Columbus would be the best job for you and the Company. You do recall, however, that we did discuss your having an option to select any area within the South Georgia District. We all realize that management changes are normally associated with reorganizations and realignment of markets. In this case, I think there is an opportunity for you to remain with the Company in a position I feel you can handle.

I understand your concern about job security but as you know I can't give you or anyone else an open-ended guarantee. However, if your performance in the Area Manager position is what I expect it to be, your concern with job security will be completely unfounded.

Although I can appreciate your disappointment at this decision, I think the fact that you will suffer no reduction in base salary or benefits is a worthwhile consideration. Additionally, if you accept the Area Manager position, it will give you an opportunity to get vesting of your retirement benefits in September of 1978 and will keep you from losing any stock option grants you've received in the past or might receive in the future. All of this should be further incentives for you staying with the Company.

I would hate to think that you walked away from these things which you earned from your years of service with KFC strictly as a matter of hurt pride and fear of the future. I truly feel that what we have offered you is fair. The things that you have earned we would like to see you receive but we cannot overcome your pride or your uncertainties about the future—only you can do that.

Very truly yours,

/s/ Harold G. Dunford
    Regional Director

HGD/np

cc: Jim Wille
    Marty Moran
    Mick McGraw

## EXHIBIT B

KFC Corporation
P.O. Box 32070
Louisville Kentucky 40232
(502) 459 8600

December 9, 1977

Mr. William A. Frazer
3137 West Britt David Road
Columbus, GA 31904

Dear Bill:

I was disappointed to learn that you had again turned down a job opportunity offered by KFC.

The District Manager, Field Services job Bill Evans offered you seemed to be a perfect fit. You could have worked out of Columbus, Georgia with no loss of pay or benefits in a position which is at a comparable level to the job you previously held for KFC. With this development and your refusal to even consider the Area Manager Alternative offered by Harold Dunford, it seems that you aren't really interested in working for KFC.

I really believe we have been extremely fair and reasonable in your case but you have made it effectively impossible for us to help you. I'm sorry that we weren't able to convince you to accept these job offers and hope you are able to develop other attractive employment opportunities.

Very truly yours,

/s/ Martin J. Moran, Jr.
Vice President
Human Resources

MJM:r

FOOD SERVICE & FRANCHISING GROUP