Mary CROCKWELL, Plaintiff,

v.

BLACKMON–MOORING STEAMATIC,
INC., Defendant.

No. 82–2919 GB.

United States District Court,
W.D. Tennessee, W.D.

Apr. 12, 1985.

Donald A. Donati and Wanda Donati, Memphis, Tenn., for plaintiff Mary Crockwell.

Jason O. Young, Jr., Memphis, Tenn., for defendant Blackmon-Mooring and Steamatic.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GIBBONS, District Judge.

Plaintiff here seeks relief for alleged violations of 42 U.S.C. Section 2000e *et seq.* and 29 U.S.C. Section 206(d). The court heard the case on September 6 and 7, 1984. The court has considered all the evidence presented and applicable law and makes the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

Plaintiff, Mary Crockwell, who is female, began working for defendant Blackmon-Mooring Steamatic, Inc. on a part-time basis in November, 1981, and on a full-time basis on May 12, 1982. Plaintiff was hired as a household cleaner at a rate of $4.00 per hour and remained in that position with the same salary until she was discharged on October 20, 1982. During plaintiff's employment defendant had two primary job classifications for non-supervisory employees: household cleaners and carpet cleaners. The carpet cleaners were also called cleaning technicians or crew members. During plaintiff's entire period of employment, all the household cleaners were fe-

males and all the carpet cleaners were males. In fact, all 116 cleaning technicians employed by defendant throughout the country were male.

Between September, 1980, and August, 1983, defendant hired 17 males as carpet cleaners. During the same period of time, plaintiff hired 19 females as household cleaners. Eleven of the males were hired at a base rate of $4.00 an hour; one male was hired at a base rate of $4.50; and five males were hired at a base rate of $5.00 an hour. All 19 females were hired at a base hourly rate of $4.00.

Household cleaners had no opportunity for a raise unless they were promoted to supervisor. On the other hand, cleaning technicians either started at $5.00 an hour or quickly received a raise up to $5.00 an hour. Cleaning technicians could participate in the incentive pay program which paid them as high as $8.00 an hour, while household cleaners could not.

The jobs of household cleaner and carpet cleaner both involved cleaning businesses and residences through strenuous physical work. The duties of household cleaners included cleaning walls, ceilings, and floors with mops and industrial chemicals at private homes or commercial establishments that had been damaged by fire. They also cleaned furniture and household effects such as plates, china, and silver. The cleaning crew or technician's job involved cleaning carpet and draperies with heavy steam machines. The cleaning crews also did some selling of services to customers. Both jobs required frequent lifting of heavy furniture. Both household cleaners and carpet cleaners carried their own equipment, but on occasion the household cleaners assisted the cleaning crews in loading and unloading the steam machines. The household cleaners job was dirtier than the cleaning crew job and they were sometimes referred to by management personnel as "fire girls."

Both household cleaners and cleaning crew members performed "pack-out" jobs. A "pack-out" is the removal of all damaged items from a house by packing them into boxes and carrying those boxes to the company's warehouse for cleaning. After cleaning, the items are returned to the house. On pack-out jobs the work done by males and females was identical. From September, 1980, through at least July 23, 1982, male employees drew pay for pack-out duties at the rate of $7.00 an hour. During this time period females were paid their regular hourly rate and drew no special pack-out pay. From November, 1981, through July, 1982, plaintiff received no special pack-out pay even though she performed pack-out duties. After July, 1982, the pack-out pay was changed so that both male and female employees drew pay for pack-out duties at a rate of $6.00 an hour.

Plaintiff complained about the disparity in wages for the pack-out jobs. Brian Lamb, manager of the defendant's Memphis office, acknowledged in his testimony that there were complaints about the pay and that he was responsible for equalizing the pay rates for pack-out jobs when he became manager by increasing the female rate and decreasing the male rate. Plaintiff also complained about the wage disparity between household cleaners and cleaning technicians. When she did so and asked about the possibility of transferring to a cleaning crew position in Texas, she was told that the company did not think women should or could lift the heavy machines used by the cleaning crew. Plaintiff was capable of performing the job of cleaning technician, but was not afforded an opportunity to do so.

Plaintiff acted as lead worker in the household cleaning crew for two or three months and was in the job at the time she was discharged on October 20, 1982.

On October 20, 1982, Karen McGhee, a female household cleaner was called by the assistant manager, Steve Thornton, to come into the conference room in the office area of defendant's place of business. Thornton was acting at the request of Don Plattner, an adjuster with Shelter Insurance Company who provided a substantial amount of business to defendant. Besides Plattner and Thornton, Lamb and two oth-

er supervisors were present in the conference room when McGhee was called into the room. Lamb knew that Don Plattner often used embarrassing language and made suggestive remarks about women. Other management employees were also aware of Plattner's propensity to make such comments. Plattner asked McGhee if she was married, if she "messed around" on her boyfriend, and commented that she had a "nice ass."

Plattner's comments upset McGhee who returned to the warehouse and discussed the matter with plaintiff. Plaintiff called Thornton and asked him to come to the warehouse to discuss the problem. Thornton came, and during the discussion plaintiff asked that Plattner apologize for the remarks. Thornton replied that this kind of activity was part of the job and that McGhee either had to accept it or to "hit the clock." Plaintiff informed Thornton that McGhee was a good worker and that plaintiff hated to lose her. Plaintiff also expressed her opinion that household cleaners should not have to endure this type of treatment. Thornton later returned to the warehouse a second time at plaintiff's request. During the second conversation, plaintiff again said it was unfair to subject McGhee to this treatment in order to maintain her job and requested that management do something to stop this type of conduct. During the second conversation defendant's office manager, June McDaniel, stated that she had been subjected to similar conduct and that it was to be expected.

Two hours after the incident with Don Plattner, plaintiff was fired by Brian Lamb. Lamb told plaintiff that she was fired for sitting down on a job and for poor attendance. Plaintiff did not receive a termination slip at that time, but received a separation letter after defendant had been contacted by the EEOC. Prior to termination she had received no written or oral warnings about her job performance, although company policy was apparently to warn an employee first before discharge.

Lamb testified that he did not intend to fire plaintiff the day of the Karen McGhee occurence. He said that plaintiff was fired on the recommendation of June McDaniel and Steve Thornton for excessive absenteeism, tardiness, sitting down on a job and walking off the job without permission. Although Thornton and McDaniel denied ever recommending plaintiff's discharge, the preponderance of the evidence establishes that they did so. Their recommendations to Lamb brought about his decision to fire plaintiff.

Plaintiff was apparently the only employee discharged for inadequate job performance while Brian Lamb was employed by defendant.

Defendant presented a chart compiled from June McDaniel's desk calendar which indicated that plaintiff missed 15 days of work while employed by defendant on a full-time basis and that she was late to work 7 times. The chart was compiled after plaintiff's termination, and the desk calendar was not available at trial. Attendance records like those kept for other employees did not note plaintiff's absences. Plaintiff conceded, however, a significant number of absences and noted that during her period of employment she injured her back and also became pregnant and had a miscarriage. Plaintiff had had two prior miscarriages. Defendant knew about these, and plaintiff was offered additional time off from work due to her pregnancy.

Two specific incidents were cited by defendant at trial as reasons for plaintiff's discharge.

A few weeks before plaintiff's discharge by defendant, an incident occurred on a job in Collierville. On that job plaintiff and other employees went to the truck and sat there to wait for other employees to finish their work. Defendant contended that plaintiff sat down on the job. Plaintiff testified that this occurred with Thornton's permission and that it happened because the employees ran out of the product they needed to clean the premises and they could not proceed any further that day.

Plaintiff's testimony about this incident is credible.

A second incident occurred shortly before plaintiff's discharge. On this occasion defendant asserts that plaintiff left the job early without permission from the front office. June McDaniel's testimony suggests that plaintiff left to be with her boyfriend. Plaintiff contends that she was ill. Whatever the reason for plaintiff's departure, it does appear that this incident occurred.

On September 27, 1982, after plaintiff had accumulated a significant number of absences according to defendant's records, June McDaniel wrote to a former employee and advised her that defendant had a "full crew of girls" in household cleaner positions who seemed to be doing a good job.

Plaintiff earned approximately $400–$500 net per month while employed by defendant full-time. Although the regular work week was forty hours, there was not always work available for a forty hour week.

Subsequent to her termination plaintiff worked for a short time at the Red Lobster Restaurant where she earned $426.98. She then sought other employment, but found no work until January, 1984. At that time she started doing housekeeping and yard work and has earned approximately $250.00 per month. Plaintiff suffered a loss of medical insurance benefits as a result of her termination. She has incurred medical bills since that time.

The parties have stipulated to certain facts in the pretrial order and amendments to that order. Those stipulations are incorporated here.

## II. CONCLUSIONS OF LAW AND ANALYSIS

The court has jurisdiction of this case under 42 U.S.C. Section 2000e *et seq.* and 29 U.S.C. Section 206(d).

### A. The Equal Pay Act Claim

■ To establish a claim of unequal pay for equal work under the Equal Pay Act, plaintiff has the burden of proving that the employer pays different wages to employees of the opposite sex for equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions. *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); *Odomes v. Nucare, Inc.,* 653 F.2d 246, 250 (6th Cir. 1981). The use of the phrase "equal work" does not require that jobs be identical, but only that there be a "substantial" equality of skill, effort, responsibility and working condition. *Odomes v. Nucare, Inc.,* 653 F.2d at 250; *see Brennan v. Owensboro-Daviess County Hospital, Inc.,* 523 F.2d 1013 (6th Cir.1975), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2170, 48 L.Ed.2d 796 (1976). Whether the work is substantially equal must be assessed on a case-by-case basis by making an overall comparison of the work, not its individual segments. *Id.* Even if the work is substantially equal, there is no violation if defendant proves that the wage disparity is based upon a seniority system, merit system, quality or quantity of work, or a factor other than sex. 29 U.S.C. Section 206(d)(1).

■ Plaintiff asserts a two-fold claim under the Equal Pay Act. She first asserts that she was paid a lower hourly wage as a household cleaner than male carpet cleaners while the work was substantially equal. Secondly, she asserts she was paid less for equal pack-out work. The court concludes that plaintiff has shown by a preponderance of the evidence that she did perform substantially equal work when doing pack-out work. However, she has failed to show that the work done by the household cleaners and carpet cleaners when not doing pack-out jobs was substantially equal.

Plaintiff was only paid $4.00 an hour for pack-out work, while males were paid $7.00 an hour. After July 23, 1982, the pack-out pay was equalized to $6.00 an hour. The Equal Pay Act specifically provides that no employer who is in violation of the Act shall "reduce the wage rate from any employee." 29 U.S.C. Section 206(d)(1). Plaintiff has carried her burden of estab-

lishing that defendant violated the Equal Pay Act by paying her $4.00 an hour for pack-out work when males received $7.00 and by reducing the wage rate for males. Although plaintiff does not have standing to complain about the males' pay reduction, this violation simply means that plaintiff should have received $7.00 an hour for all pack-out work during her employment. Defendant has not asserted that it has any affirmative defense to this wage disparity.

■ With respect to the equal pay claim for work other than pack-out jobs, plaintiff has not demonstrated that she performed substantially equal work to that of male cleaning technicians.

Defendant's claim is that plaintiff's duties as a household cleaner involved light work, while the carpet cleaners had to do heavy lifting and physical labor. The record strongly supports a contrary conclusion. Plaintiff and other household cleaners did as much physical labor and lifting as the carpet cleaners. Their job was probably more strenuous and certainly dirtier than the carpet cleaners. The working conditions were substantially the same. However, the substantially equal test is not met. Carpet cleaners did operate steam machines not operated by the household cleaners. Further, they handled sales to customers. In addition, the core duties of the job were not the same—carpet cleaners cleaned carpets and drapery while household cleaners cleaned the structural interiors of buildings and household effects.

■ Plaintiff is entitled to back pay for defendant's violation of the Equal Pay Act. 29 U.S.C. Section 216(b). In addition, she may recover an amount equal to the back pay as liquidated damages unless defendant can demonstrate that a good faith effort was made to comply with the law. 29 U.S.C. Section 216(b); *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429 (D.C.Cir. 1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). Here defendant made no effort at all to comply with the Equal Pay Act with respect to pack-out pay. In fact, lowering the wage rate of males demonstrates an absence of good faith. Therefore, liquidated damages in addition to back pay are appropriate.

Back pay under the Equal Pay Act in this case should be computed based upon the difference in the hourly rate received by plaintiff for pack-out work and the amount she would have been paid at the rate of a cleaning technician. This would be $3.00 per hour for all hours spent doing pack-out work. However, the record in this case contains no indication of the number of pack-out hours worked, and thus there is no basis for computing the relief to which plaintiff is entitled under the Equal Pay Act.

### B. The Title VII Claim [1]

■ Title VII specifically prohibits discrimination in compensation based on sex. 42 U.S.C. Section 2000e–2(a). A plaintiff who proves intentional sex-based discrimination in compensation may recover under Title VII unless the difference in wages is made pursuant to one of the four affirmative defenses set forth in the Equal Pay Act, 29 U.S.C. Section 206(d)(1).[2] *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

---

**1.** In addition to the issues addressed here with regard to the Title VII claim, plaintiff originally also contended that defendant had violated Title VII by failing to promote her to carpet cleaner or to supervisor of household cleaning and by creating a sexually offensive work environment. These issues were not addressed in plaintiff's post-trial proposed findings and conclusions, and the court considers them abandoned by plaintiff. In any event, plaintiff did not carry her burden on these issues. There is no proof that a carpet cleaner vacancy existed during plaintiff's employment or that plaintiff was denied promotion into it. Further, there is no evidence that failure to place plaintiff permanently in the supervisory position was due to sex-based discrimination. Further, while there was some testimony about off-color remarks, this proof was not sufficient to establish the existence of an offensive work environment.

**2.** The defenses are that the pay is based on (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity and quality of production, or (4) a differential based on any factor other than sex.

*Gunther* left unresolved whether the standard Title VII rules of *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), apply to the order and allocation of proof in Title VII sex-based wage discrimination claims or whether the employer has the burden of proving its actions justified by one of the Equal Pay Act defenses. The Sixth Circuit has not specifically addressed the issue since *Gunther.*[3] This court, however, does not believe that the Bennett Amendment, which *Gunther* interpreted, alters the standard Title VII rules about burden of proof in sex-based wage discrimination cases. Therefore, the court has applied the *McDonnell Douglas* and *Burdine* analysis in its consideration of the Title VII claim.

■ *Gunther* also did not articulate the elements of a *prima facie* case in claims of this type. However, the court believes that plaintiff has clearly set forth a *prima facie* case of intentional sex discrimination in her compensation. She has demonstrated that she is a member of a protected class and that she received compensation at a rate less than that of similarly situated male employees. Although the work performed by household cleaners and cleaning technicians was not "substantially equal" within the meaning of the Equal Pay Act, cleaning technicians were situated similarly to plaintiff. The jobs had many similarities and included similar requirements of effort and responsibility. Some of the duties were the same.

Once plaintiff has established a *prima facie* case, the burden of going forward shifts to defendant to articulate a legitimate nondiscriminatory reason for its action. Defendant here asserts that the difference in job duties justifies the pay difference between the job classifications and has produced some proof in support of that position.

■ After defendant has articulated such a legitimate nondiscriminatory reason, plaintiff must show that the reason given was a pretext for discrimination. Plaintiff ultimately must show that defendant's action was caused by purposeful or intentional discrimination. Plaintiff has carried this burden with respect to her Title VII claim.

■ Many factors support a finding of intentional discrimination in this case. Only women occupied plaintiff's job classification; only men—in Memphis and elsewhere—occupied the carpet cleaner positions. The jobs involved some of the same duties and were quite similar in work environment and degree of responsibility and effort required. Despite this similarity the female household cleaners were paid less than the male carpet cleaners—even when doing identical pack-out work. No household cleaners received raises; carpet cleaners got raises and even could participate in an incentive pay plan. There was simply no reason other than intentional and purposeful discrimination based on sex for paying plaintiff as a household cleaner differently from a carpet cleaner. Plaintiff has established that defendant violated 42 U.S.C. Section 2000e *et seq.* by intentionally

---

**3.** Courts have split on the issue of whether the normal Title VII allocation of proof rules apply in cases involving discrimination in compensation due to sex. Some cases have held that the Equal Pay Act burdens of proof apply in Title VII wage discrimination cases and that defendant bears the burden of establishing one of the four statutory affirmative defenses. *Schulte v. Wilson Indus., Inc.,* 547 F.Supp. 324, 337 (S.D. Tex.1982); *Kouba v. Allstate Ins. Co.,* 523 F.Supp. 148, 156–57 (E.D.Cal.1981), *rev'd on other grounds,* 691 F.2d 873 (9th Cir.1982). In fact, the court in *Schulte* said that the Sixth Circuit opinion in *Odomes* was consistent with this reasoning. 547 F.Supp. at 337. However, the

Sixth Circuit opinion in *Odomes* does not address this point. The court found the analysis under Title VII and the Equal Pay Act to be "essentially the same" but the case cited for this proposition recognizes the differing burdens for defendants under the statutes. *Odomes v. Nucare, Inc.,* 653 F.2d at 250 (citing *Strecker v. Grand Forks County Social Services Board,* 640 F.2d 96, 99 n. 1 (8th Cir.1980) ). In addition, the Sixth Circuit in *Hall v. Ledex, Inc.,* 669 F.2d 397, 399 (6th Cir.1982), applied the standard rules in a compensation case without specifically discussing *Gunther* or the Equal Pay Act affirmative defenses.

discriminating against plaintiff in her compensation. She is entitled to recover the difference between the compensation she received and that she would have received if paid on the same basis as a carpet cleaner.[4] The proof establishes that at a minimum there was a $1.00 differential between pay for plaintiff and cleaning technicians.

## C. The Retaliation Claim

Plaintiff also claims that she was discharged in retaliation for her opposition to an unlawful employment practice in violation of 42 U.S.C. Section 2000e–3(a).

In order to establish a *prima facie* case under 42 U.S.C. Section 2000e–3(a), plaintiff must demonstrate (1) that she is engaged in protected activity; (2) that the employer knew of this protected activity; (3) that she was subsequently discharged or subjected to other damages; and (4) that the employer had a retaliatory motive or that the timing of the action was such as to allow an inference of retaliation to arise. *Sutton v. National Distillers Prod. Co.,* 445 F.Supp. 1319, 1325–26 (S.D. Ohio 1978), *aff'd,* 628 F.2d 936 (6th Cir. 1980); *EEOC v. St. Joseph Paper Co.,* 557 F.Supp. 435, 438–39 (W.D.Tenn.1983). Clearly, plaintiff has established a *prima facie* case. First, she engaged in the protected activity of opposing defendant's conditioning Karen McGhee's continued employment on her acceptance of treatment like that of Plattner.[5] An employee who opposes discriminatory practices directed at another employee has engaged in protected activity under Title VII. *Novotny v. Great American Federal Savings and Loan Ass'n,* 584 F.2d 1235, 1260–61 (3rd Cir. 1978), *remanded on other issues,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Eichman v. Indiana University,* 597 F.2d 1104, 1107 (7th Cir.1979). In the present case, the employer clearly knew of plaintiff's opposition. Since plaintiff was discharged within two hours of engaging in protected activity, an inference of retaliation arises.

Once a *prima facie* case is established, the burden is cast upon the employer under *Burdine* to articulate a legitimate, nondiscriminatory reason for the discharge. Defendant has argued and presented evidence that plaintiff was terminated for excessive tardiness and absenteeism, refusing to work, and leaving work without permission and thus it has articulated a legitimate, nondiscriminatory reason for discharge.

Plaintiff has established by a preponderance of the evidence that her discharge was motivated by retaliation against plaintiff for complaining about the treatment of Karen McGhee. Plaintiff was discharged two hours after opposing the treatment of McGhee. Lamb testified that but for the Karen McGhee incident, plaintiff would not have been fired on the day that she was fired. He further indicated that but for the recommendation made by Steve Thorn-

---

**4.** This court has not adopted "comparable worth" as a basis of recovery, but has simply found that defendant intentionally discriminated against plaintiff with regard to compensation due to her sex. *See County of Washington v. Gunther,* 452 U.S. at 183, 101 S.Ct. at 2254–55; *Plemer v. Parsons-Gilbane,* 713 F.2d 1127 (5th Cir.1983).

**5.** Conditioning of continued employment on acceptance of suggestive remarks made by a non-employee can violate Title VII. The proof here establishes that such a violation occurred. Thornton called McGhee, a young female employee, into the room to talk to Plattner. There was no business reason for the conversation, and Plattner's inclinations were known to Thornton and other management personnel. After the incident Thornton quickly advised McGhee that her continued employment was conditioned on cheerful acceptance of such treatment.

Further, this court agrees with those courts holding that opposed activity need not actually violate Title VII. It is sufficient if plaintiff acts on a reasonable belief that defendant has committed an unlawful employment practice. *Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1182 (7th Cir.1982); *Parker v. Baltimore & Ohio Railroad Co.,* 652 F.2d 1012, 1019–20 (D.C.Cir.1981); *Sias v. City Demonstration Agency,* 588 F.2d 692, 695–96 (9th Cir.1978); *Croushorn v. Board of Trustees of University of Tenn.,* 518 F.Supp. 9, 25 (M.D.Tenn.1980). Plaintiff in this case was acting on such a good faith and reasonable belief in protesting defendant's conduct toward McGhee.

ton and June McDaniel to fire plaintiff, plaintiff would not have been fired at all. In addition, defendant's asserted legitimate nondiscriminatory reason for discharge was pretextual. Plaintiff received no warning prior to discharge. Records supporting her absence and tardiness were compiled after termination. Plaintiff's version of at least the Collierville incident was more credible than defendant's. Finally, defendant could hardly have been too upset about plaintiff's absences when it offered her additional time off during her pregnancy. The protected activity prompted the discharge. Plaintiff's protest was the but for cause of her discharge on October 20, 1982.

██ Plaintiff has carried her burden of proving that her discharge was unlawful retaliation in violation of 42 U.S.C. Section 2000e–3(a). Plaintiff is entitled under 42 U.S.C. Section 2000e–5(g) and (k) to an award of full back pay less any wages earned from other employment from the date of her termination until January, 1984. The rate of pay is to be similar to that of cleaning technicians.

The record in this cause contains proof on which an award of back pay could be based, except for pack-out pay. However, as plaintiff notes in her proposed findings and conclusions, it is not the proof necessary to establish the most accurate amount of back pay. Further, although plaintiff did incur medical expenses subsequent to termination, there is no proof as to whether these bills would have been covered by insurance. The parties stipulated that if they could not agree on which bills would have been paid by insurance, the magistrate could take further proof on this issue.

Therefore, within 15 days of entry of this order, the parties are to attempt to agree to the amount of back pay and wages owed. If the matter is not resolved in that time, it will be referred to the U.S. Magistrate for hearing and additional proof on the remedy issues. Any objections to the taking of additional proof on the back pay issue will be filed within fifteen (15) days.

In addition, plaintiff is entitled to attorney fees in connection with this matter. Counsel for plaintiff is directed to submit within 20 days of this order evidentiary support for plaintiff's claim for attorney's fees and expenses. Defendant will have 15 days to respond to the materials submitted by plaintiff.

IT IS SO ORDERED.