**Nancy Jeanne CHURCHILL, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MA-CHINES, INC., NATIONAL SERVICE DIVISION, Defendant.**

Civ. A. No. 87–4024.

United States District Court,
D. New Jersey.

March 22, 1991.

As Amended April 16, 1991.

Phyllis Gelman, New York City, and Nadine Taub, Women's Rights Litigation Clinic, Rutgers Law School, Newark, N.J., for plaintiff.

Edward Zunz, Jr., Robert Gilson, Laura Lokker, Roberta Samuels, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J., for defendant.

## OPINION

WOLIN, District Judge.

Before the Court are plaintiff's motion seeking class certification of sex discrimination claims based on salary and defendant's cross-motion for summary judgment on plaintiff's individual claims. The Court has carefully reviewed the briefs, certifications and other documents submitted by the parties and heard oral argument. For the reasons expressed in this Opinion, the Court will deny plaintiff's motion for class certification. The Court will also deny summary judgment on plaintiff's individual claims of discrimination in salary and promotion and grant summary judgment in favor of IBM on plaintiff's constructive discharge claim.

## I. BACKGROUND

### A. *Plaintiff's Career at IBM*

Plaintiff Nancy Churchill was hired by International Business Machines, Inc. (IBM) in January, 1977 as an associate customer engineer, a position classified at IBM as an entry level (level 9)[1] position with an

---

1. IBM employs a system of classifying jobs according to different levels. The levels range from one to 62, with level one being the lowest position and level 62 being the highest position an employee can obtain prior to becoming an executive. After level 62 is the Executive Level, which also has four subclasses, ranging from E-1 to E-4. An employee's job level is one factor that is considered in determining the

annual salary of 13,200.[2] At the time she was hired, Churchill had no relevant experience in technical management. Churchill claims that when she was hired, the branch manager who offered her the position told her that her salary was $4,000 less than the salaries of other customer engineers.[3] In June 1978, Churchill was promoted to field manager, a technical management position in the Field Engineering Division, which later became the National Service Division (NSD). Churchill was subsequently promoted to service planning manager in 1981, and to programming services operations manager, a level 59 position, in 1982. In 1985, Churchill was promoted to the position of Manager of Programming Services in IBM's National Service Division, a level 61, senior technical management position, with an annual salary of $84,000 (in 1987). This position was located at IBM's offices in Franklin Lakes, New Jersey.

Churchill received fourteen salary increases during this nine and one-half year period and worked at seven IBM locations for substantial time periods. During her tenure at IBM, Churchill received extremely positive evaluations[4] and was considered to be an exceptional employee with potential to become an IBM executive. Cert. of Defendant's Counsel, Ex. E. Only one other employee of the 2000 hired in 1977, besides Churchill, managed to reach job level 61 by 1987. Cert. of Wych, Ex. B.

From 1984 through 1985, Churchill served as an administrative assistant to Thomas Vassiliades, a group director for service product planning. During her tenure, Churchill alleges that she observed salary data on approximately 300 technical managers supervised by Vassiliades. She noted that female technical managers were often receiving lower salaries than male technical managers with the same job level and performance ratings. Cert. of Plaintiff, ¶ 13. Churchill also claims that when she reached job level 61, six men with the same job level and performance ratings received higher salaries than hers.[5]

In addition, Churchill asserts that she should have been promoted to the executive level in mid–1987. Churchill's name appeared on executive resource tables,

---

amount of annual salary increase that an employee receives.

**2.** At the time she entered IBM, Churchill held a bachelor's degree in psychology from Connecticut College, an associate's degree in electrical engineering from Franklin State College, and a master's degree in education from Bridgewater State College. In 1982, while at IBM, she earned a master's degree in business administration from the State University of New York at Buffalo.

**3.** Churchill has not presented any evidence, other than her certification, in support of this allegation.

**4.** Each employee at IBM is usually evaluated every year by her immediate supervisor. The supervisor submits a written evaluation constituting several pages and the employee's performance is given a numerical rating, ranging from a "1" for superior performance to a "4" for satisfactory work and "5" for unsatisfactory work. An employee's most recent performance rating is a major factor in determining an employee's annual salary increase.

During her tenure at IBM, Churchill received four performance ratings of "1", seven performance ratings of "2," and three performance ratings of "3". Cert. of Defendant's Counsel, Ex. D. In her most recent performance evaluation, prior to her resignation during the summer of 1987, Churchill received a rating of "1". Cert. of Plaintiff, Ex. C. In the category of employee strengths, Marianne Crew, the manager conducting the evaluation, listed "leadership ability, analytical skill," and "dedication and commitment to excellence." Under the category of suggested improvements, Crew advised Churchill to "continue to learn and grow in the business."

**5.** The following monthly salary information was submitted by plaintiff:

|                  |        | 1985    | 1986   | 1987      |
|------------------|--------|---------|--------|-----------|
| W.J.             | (male) | $ 6000  | 6583   | 7083      |
| R.S.             | (male) | $ 6541  | 7000   | left IBM  |
| J.N.             | (male) | $ 7000  | 7000+  | 7000+     |
| J.A.             | (male) | $ 7000  | 7000+  | 7500      |
| G.B.             | (male) | $ 6542  | 7000   | 7500+     |
| E.B.             | (male) | $ –     | –      | 7188      |
| Nancy Churchill  |        | $ 5833  | 6416   | 7000      |

Cert. of Plaintiff, ¶ 14, Supp.Cert. of Plaintiff, ¶¶ 6, 7 and 8.

used to identify candidates for promotion to an executive position, for three executive positions that were filled by men in 1987. Promotions to the executive level at NSD are usually given to employees holding level 62 or level 61 jobs, the highest senior management levels. In 1987, there were 61 employees in level 61 and other employees at level 62. Cert. of Wych, Ex. C. The overwhelming majority (54 out of 61) of employees at level 61 in 1987, were hired by IBM during the period from 1955 through 1970.[6] On the average, it takes an employee at least 16 years with IBM to reach the executive level,[7] and executives comprise 0.05% of all IBM–U.S. employees. Cert. of Grieve, ¶ 3.

### B. *IBM's Compensation System*

IBM employs a highly individualized, merit-based system of compensation. Cert. of Defendant's Counsel, Ex. J. Four primary factors are used to establish the appropriate salary for its employees: (1) the employee's job level, based on analysis and classification of required responsibilities; (2) establishment of a salary range within each job level; (3) the employee's performance rating in her job; and (4) the assignment of a salary raise based on the first three factors and the employee's salary history.

In support of her claim that IBM discriminated against female technical managers in salary on the basis of sex, Churchill has submitted a statistical study conducted by Dr. Paula England, a professor of sociology at the University of Arizona. Cert. of Plaintiff's Expert, Ex. E. England's study, in comparing the average salaries of male and female technical managers at NSD, found a $300 average monthly pay difference for the years 1985, 1986 and 1987. England's report included a multiple regression analysis which purported to account for the effects of job level and performance rating. In response to criticism

by IBM's counsel, England submitted a revised study, which also purported to account for the effect of time in job level, in addition to performance rating and job level. The revised multiple regression analysis found a disparity of $200 in the average monthly salary between male and female technical managers at NSD. Supp. Cert. of Plaintiff's Expert, Ex. A.

### C. *Reorganization of Plaintiff's Position*

In May 1987, a new manager, John Gorman, was appointed to supervise Churchill's position. Soon after assuming his new position, Gorman reorganized Churchill's unit and eliminated Churchill's job. The reorganization took place while Churchill was on a two-week vacation. When Churchill returned from her vacation, one of her co-workers informed her that her position had been eliminated. Gorman offered Churchill a temporary staff management position at level 60. He also invited her to apply for level 62 positions as Director of Service Support at IBM locations in Boston and Philadelphia. Cert. of Defendant's Counsel, Ex. G and Ex. N.

On July 10, 1987, Churchill wrote to K.V. Cassani, a senior executive, claiming that she had been unfairly removed from her level 61 management position to a level 60 staff management position. Cert. of Defendant's Counsel, Ex. G. Churchill also reported that she had not been considered for several executive positions and that other less qualified individuals had received those jobs. Churchill expressed her feelings that she had suffered gender discrimination and requested an "Open Door" grievance investigation.[8] The "Open Door" investigation of Churchill's grievance produced a report, dated August 6, 1987, concluding that most of her concerns were not valid. Cert. of Defendant's Counsel, Ex. I. The IBM investigator also met with Churchill to discuss the report. In

---

**6.** Only four level 61 employees were hired in 1977 or later. Defendant's Brief, Ex. B.

**7.** Churchill cites examples of several employees who have reached the executive level at NSD in fewer than 16 years. Supp.Cert. of Plaintiff, ¶ 30.

**8.** "Open Door" is an internal grievance procedure at IBM under which an employee can raise concerns about any IBM manager with a more senior manager. For each grievance, IBM appoints a high level management employee to investigate the concern.

July, 1987 Churchill requested a one-year's leave of absence to allow her to take a trip around the world. Cert. of Defendant's Counsel, Ex. J. IBM did not act on Churchill's request. On August 10, 1987, Churchill resigned from IBM.

### D. Claims in this Lawsuit

On August 19, 1987, Churchill filed a complaint with the Equal Employment Opportunity Commission (EEOC), claiming the IBM had discriminated against her and other female employees. On October 2, 1987 Churchill filed this action against IBM, alleging violation of the Equal Pay Act, 29 U.S.C. § 206. In April 1988, following the EEOC's investigation of her complaint, Churchill received a right to sue letter from the EEOC. She amended her complaint and added claims alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, on her own behalf and on behalf of all female technical managers in IBM's National Service Division (NSD) on or after August 1985.

Churchill's individual claims involve charges that IBM discriminated against her in salary and in promotions and that she was constructively discharged from her job. Churchill's claims on behalf of the class of female technical managers in NSD charge that IBM discriminated against the class in establishing individual salaries. Five potential class members have filed affidavits, using fictitious names due to fear of retaliation by IBM, claiming that IBM discriminated against them with regard to salary. Churchill seeks backpay, including financial fringe benefits, and injunctive relief barring sex discrimination with respect to female technical managers at NSD.

After three years of numerous discovery disputes and other delays, the Court ordered Churchill to file her motion for certification of this action as a class action pursuant to Federal Rule 23 by November 5, 1990. Churchill filed this motion and defendant IBM has opposed class certification and moved for summary judgment on plaintiff's individual claims pursuant to Federal Rule 56.

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The party moving for summary judgment has the burden of showing that there is no genuine issue of material fact, and once the moving party has sustained this burden, the opposing party must introduce specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 464 (3d Cir.1989).

A genuine issue is not established unless the evidence, viewed in a light most favorable to the nonmoving party, would allow a reasonable jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Radich v. Goode*, 886 F.2d 1391, 1395 (3d Cir.1989). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Radich*, 886 F.2d at 1395. Whether a fact is material is determined by substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *United States v. 225 Cartons*, 871 F.2d 409, 419 (3d Cir.1989).

Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to his case, and on which he will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, depositions, interrogatory answers, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53; *Cooley v. Pennsylvania Housing Finance Agency*, 830 F.2d 469, 474 (3d Cir.1987).

B. *Salary Discrimination Claims under Title VII and EPA*

In this case, Churchill has brought individual claims under both Title VII and the Equal Pay Act. Churchill seeks certification of a class-action under Title VII for sex discrimination in salary on behalf of all female technical managers at NSD.[9] IBM claims that it is entitled to summary judgment on Churchill's individual claims that IBM engaged in sex-based salary discrimination in violation of Title VII and the Equal Pay Act. The Court will first discuss defendant's summary judgment motion because granting summary judgment on plaintiff's salary claim would nullify plaintiff's motion for class certification.

1. Applicable Burdens of Proof

■ In order to decide this motion for summary judgment, the Court must consider the burdens that parties will bear at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. In a traditional Title VII claim, the plaintiff must establish a prima facie case of sex discrimination by a preponderance of the evidence.[10] *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the plaintiff has established a prima facie case, the burden of production shifts to the defendant to articulate a legitimate business reason for the discrimination. *Id.* In a Title VII claim, unlike a claim under the Equal Pay Act, the ultimate burden of

persuading the trier of fact remains at all times with the plaintiff. *Watson v. Ft. Worth Bank and Trust,* 487 U.S. 977, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988); *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

■ In *County of Washington v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), the Supreme Court held that the "Bennett Amendment" to Title VII extended the protection of the four affirmative defenses of the Equal Pay Act to Title VII claims involving sex-based wage discrimination. Therefore, wage differentials attributable to one of the four affirmative defenses are not unlawful employment practices under Title VII. *See* 42 U.S.C. § 2000e–2(h). Thus, in a claim based on discrimination in salary, the defendant must produce evidence to demonstrate that the alleged disparity in pay was due to one, or a combination of, four factors: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any factor other than sex. Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1).

■ The burdens under the Equal Pay Act are slightly different than those under Title VII. In order to establish a prima facie case under the Equal Pay Act, a plaintiff must show that an employer pays different wages to male and female employees for equal work on jobs the performance of which requires equal skill, ef-

---

**9.** At oral argument, counsel questioned whether plaintiff could bring a class action if she had not alleged claims on behalf of the class in her EEOC complaint, thereby failing to satisfy the jurisdictional requirements for a Title VII claim. Churchill stated in her EEOC complaint that IBM had discriminated against other women on the basis of gender. The Third Circuit has recognized that as long as class issues are raised in the charge giving notice to the defendant, as they were in Churchill's EEOC complaint, a timely charge provides the jurisdictional basis for a class action. *Lusardi v. Lechner,* 855 F.2d 1062, 1078 (3d Cir.1988). Therefore, defendant may not object to the class claims based on the EEOC charges.

**10.** A plaintiff may establish a prima facie case of discrimination under Title VII in two ways: disparate treatment and disparate impact.

Since plaintiff's papers are entirely unclear as to which theory plaintiff is alleging, the Court will consider her claims under both theories. In a disparate impact case, the plaintiff must demonstrate that a facially neutral policy or practice by an employer has a disparate impact on the plaintiff's gender. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989); *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). Unlike a disparate treatment case, proof of discriminatory intent is not required. Rather, to prove a claim, the plaintiff must show that a specific employment practice has a substantially disproportionate impact on the protected class. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

fort and responsibility. 29 U.S.C. § 206(d)(1); *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). Once plaintiff has set forth a prima facie case, both the burdens of production and persuasion shift to the defendant. The defendant must demonstrate that the discrepancies in pay between the sexes are justified by one of the four affirmative defenses in the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any factor other than sex. 29 U.S.C. § 206(d)(1); *Corning Glass Works,* 417 U.S. at 196, 94 S.Ct. at 2229.

The Supreme Court, in *Gunther,* expressly declined to decide how the Equal Pay Act defenses were to be incorporated into the overall burden-shifting scheme of Title VII. 452 U.S. at 171, 101 S.Ct. at 2249. Neither the Supreme Court nor the Third Circuit has yet ruled on this issue.[11] The Ninth Circuit has interpreted *Gunther* as incorporating the entire burden structure of the Equal Pay Act into Title VII claims for sex-based wage discrimination. *Kouba v. Allstate Insurance Co.,* 691 F.2d 873, 875 (9th Cir.1982). Thus, it held that in a Title VII sex-based wage discrimination case, the defendant bears both the burdens of production and persuasion in establishing that the salary discrepancy meets one of the four defenses. *Id.* The Sixth and Eighth Circuits have concurred with this analysis and held that the Equal Pay Act burdens are applicable to claims for salary discrimination based on sex under Title VII. *Korte v. Diemer,* 909 F.2d 954, 958–59 (6th Cir.1990) (distinction of burdens between the two statutes is "overly technical"; Equal Pay Act violation is Title VII violation); *Floyd v. Kellogg Sales Co.,* 841 F.2d 226, 229 n. 2 (8th Cir.), *cert. denied,* 488 U.S. 970, 109 S.Ct. 501, 102 L.Ed.2d 537 (1988); *McKee v. Bi–State Development Agency,* 801 F.2d 1014, 1018–19 (8th Cir.1986). *See also Denny v. Westfield State College,* 669 F.Supp. 1146, 1155–56 (D.Mass.1987), *aff'd,* 880 F.2d 1465 (1st Cir.1989).

The Fifth, Fourth and Seventh Circuits have disagreed with the application of Equal Pay Act burdens to Title VII claims. In *Peters v. City of Shreveport,* 818 F.2d 1148 (5th Cir.1987), *cert. dismissed,* 485 U.S. 930, 108 S.Ct. 1101, 99 L.Ed.2d 264 (1988), the Fifth Circuit determined that Bennett Amendment did not incorporate the structure of sex-discrimination claims under the Equal Pay Act into Title VII. *Id.* at 1160–61. The court reasoned that such incorporation would alter a causal element of the plaintiff's Title VII case and stretch the Bennett Amendment "too far." *Id. See also Brewster v. Barnes,* 788 F.2d 985, 992–93 n. 13 (4th Cir.1986) (plaintiff satisfied burden under Equal Pay Act but could not recover under Title VII); *Marcoux v. Maine,* 797 F.2d 1100, 1105–06 (1st Cir.1986) (court expressed doubts about equating the Equal Pay Act with Title VII, but did not decide the issue); *Seligson v. Massachusetts Institute of Technology,* 677 F.Supp. 648 (D.Mass.1987).

The Seventh Circuit, in *Fallon v. Illinois,* 882 F.2d 1206 (7th Cir.1989), has engaged in the most detailed analysis of this issue to date and has ruled that sex-based salary discrimination claims under Title VII and Equal Pay Act claims are not coextensive. According to the court, the Equal Pay Act, unlike Title VII, creates a type of strict liability in that no intent to discriminate needs to be demonstrated. *Fallon,* 882 F.2d at 1213. The court explained that the burden of proof allocates the risk of nonpersuasion. *Id.* at 1217. If the trier is in doubt, it must decide against the party bearing the burden of proof. *Id.* A finding of Equal Pay Act liability therefore means only that the employer failed to satisfy its burden of proof. *Id.* A successful Equal Pay Act claim is not inconsistent with finding that the employer did not in-

---

11. In *Shultz v. Wheaton Glass Co.,* 421 F.2d 259 (3d Cir.), *cert. denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970), the Third Circuit assumed, without discussion, that the burdens under the Equal Pay Act and Title VII are the same in salary discrimination cases. Since this case was decided prior to the Supreme Court's decision in *Gunther,* the continuing validity of this precedent is in doubt.

tentionally discriminate because discriminatory intent is not an element of an Equal Pay Act claim. *Id.* The court observed that it is possible that a plaintiff could fail to meet its burden of proving a Title VII violation, and at the same time the employer could fail to carry its burden of proving an affirmative defense under the Equal Pay Act. *Id.*[12] *See also Brewster v. Barnes,* 788 F.2d at 992–93 (plaintiff satisfied Equal Pay Act burden but could not recover under Title VII).

■ This Court agrees with the Seventh Circuit's analysis and holds that the incorporation of the Equal Pay Act standards into a Title VII claim for sex-based wage discrimination did not transform the allocation of burdens under Title VII into Equal Pay Act burdens. Thus, the Court believes that should be decided in accordance with the traditional Title VII scheme of burdens.

### 2. Prima Facie Case of Salary Discrimination

In support of her individual claims under Title VII and the Equal Pay Act, Churchill has relied primarily on three pieces of evidence. First, she claims that six men within her job level at IBM, who received the same performance evaluation, received a higher salary than she did. Cert. of Plaintiff, ¶ 14, Supp.Cert. of Plaintiff, ¶¶ 6, 7 and 8. Secondly, she claims that she made general observations that male technical managers received higher salaries than female technical managers. Cert. of Plaintiff, ¶ 13. Finally, she has presented a statistical study which purportedly demonstrates a $200 average monthly pay differential between male and female technical managers. Supp.Cert. of Plaintiff's Expert, Ex. A.

■ Upon close evaluation, the Court questions whether this evidence can establish a prima facie case of sex-based salary discrimination. IBM has submitted an exhaustive explanation of its pay system and this detailed description rebuts much of plaintiff's evidence. First, IBM operates an entirely individualized compensation system such that persons in the same job level, with identical performance ratings, frequently receive different salaries, due to differences in their time with the corporation and their salary history at IBM. Thus, Churchill's claims that some men with the same job level and performance evaluation received higher salaries than some women is essentially meaningless. Churchill's subjective impression, based only on her selective review of records at IBM and personal experience, that women received lower salaries than men is not sufficient on its own to support her prima facie case. Conclusory statements, based on knowledge gained as a supervisor that female technical managers were paid less than males, have been found to be insufficient to create a prima facie case. *Grant v. Pfizer, Inc.,* 683 F.Supp. 41, 43 (S.D.N.Y.1988).

Churchill's expert statistical report, allegedly finding a pay discrepancy of $200 between male and female managers,[13] has

---

12. In *Fallon,* the court also analyzed the EEOC regulations enforcing Title VII and the Equal Pay Act. The EEOC regulations, which became effective in 1986, provide that where the jurisdictional prerequisites of both statutes are met, "any violation of the Equal Pay Act is a violation of Title VII." 882 F.2d at 1277 (quoting 29 C.F.R. § 1620.27). The court refused to give deference to this regulation because it varied from the EEOC's prior policy, as expressed in its 1981 regulations, and no new legislative history had been introduced to support the change. *Id.* at 1218. Furthermore, the court found "the EEOC's interpretation at odds with the long-standing interpretation of Title VII as requiring a finding of discriminatory intent." *Id.*

13. Plaintiff's statistical report, prepared by Dr. Paula England, a professor of sociology at the

University of Arizona, found an average monthly salary difference of approximately $300 between male and female technical managers in IBM's National Service Division, in each of the years 1985, 1986 and 1987. The multiple regression analysis performed by Dr. England originally purported to account for the impact of job level and performance rating on the salary differences.

Defendant, in its opposition papers, challenged Dr. England's conclusions because she had failed to consider other legitimate factors that might affect the salaries, such as the employee's time in level, prior relevant experience, prior salary history, and time with IBM. In response to defendant's criticisms, Dr. England included the factor of time in job level in the multiple regression analysis. This revised study found that time in job level did account for

some probative value. The multiple regression analysis performed by plaintiff's expert calculates the average monthly salary difference for the years 1985, 1986 and 1987 and purports to account for the factors of job level, performance rating and time in job level, as these factors would affect an employee's salary. However, the study appears to have several flaws. First, it calculates averages using very different sample sizes. For instance, the salary of a group of 93 male managers is compared with the salary of only 2 female managers. *See* Cert. of Plaintiff's Expert, Table 1, level 57. Second, the comparison based on averages may be misleading because IBM's salary system is highly individualized. Furthermore, other variables, not accounted for in the multiple regression analysis, such as the employee's time with the company and prior salary history, may have affected the results.

As the Supreme Court noted in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Id.* at 340, 97 S.Ct. at 1856–57.

Recently the Supreme Court again expressed its concerns about statistical evidence, maintaining that courts are not "obliged to assume that plaintiff's statistical evidence is reliable." *Watson*, 487 U.S. at 996, 108 S.Ct. at 2789. Weaknesses in statistical studies may include "small or incomplete data sets," "inadequate statistical techniques," or other deficiencies which may emerge from the unique facts of the case. *Id.* 108 S.Ct. at 2790. While the Court held in *Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), that multiple regression analyses may be employed in cases charging a "pattern or practice" of discrimination, it recognized that although failure to include all relevant variables may not be grounds for excluding

statistical evidence, the failure to consider variables may affect the study's probativeness. *Id.* at 400, 106 S.Ct. at 3009. Furthermore, the Court noted that some regressions may be so incomplete as to be inadmissible as irrelevant. *Id.* at n. 10.

In *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302 (7th Cir.1988), the EEOC brought wage discrimination claims on behalf of a class of female employees at Sears. The EEOC relied primarily on an expert's multiple regression analysis to show that Sears' Executive Compensation Program was discriminatory. *Id.* at 348. The district court held that the statistical study was so flawed that it lacked persuasive value. *Id.* In its review of the district court's determination, the Seventh Circuit agreed that two important limitations affected the probativeness of the statistics: (1) important variables were omitted from the model and (2) the study aggregated data nationwide when local decisionmakers had considerable discretion in salary decisions. *Id.* at 349–50. The Seventh Circuit concluded that the district court did not clearly err in determining that the EEOC's regression analyses were not probative of sex discrimination in wages. *See also Coser v. Moore*, 739 F.2d 746, 753–54 (2d Cir.1984) (plaintiffs' multiple regression study not persuasive in establishing sex discrimination in salaries because studies failed to consider the effects of prior salary and existing duties on salary). The court asserted that when statistics are flawed, "strong evidence of individual instances of discrimination becomes vital to the plaintiff's case." *Sears, Roebuck*, 839 F.2d at 311 (citations omitted). Such strong evidence is missing from Churchill's case.

However, other courts of appeals have espoused a more tolerant view of statistical evidence of discrimination. The majority of appellate courts have concluded that the Supreme Court's decision in *Bazemore* "requires that the defendant do more than simply point out possible flaws in the proponent's statistical analyses in order to rebut the inference of discrimination raised

---

some of the salary discrepancy. However, an average salary difference of approximately $200 per month remained for male and female technical managers.

by the statistical evidence." *EEOC v. General Telephone Co. of Northwest, Inc.*, 885 F.2d 575, 579 (9th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 370, 112 L.Ed.2d 332 (1990). The Ninth Circuit followed this approach in *General Telephone,* finding that, when the statistical omissions are not so flawed that a defendant could defeat an inference of discrimination merely by pointing out such omissions, a defendant must do more than merely state that certain variables should have been included. *Id.*

In *Sobel v. Yeshiva Univ.,* 839 F.2d 18 (2d Cir.1988), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989), the Second Circuit addressed the use of regression analyses to prove a claim of gender-based wage discrimination at a medical school. The court rejected the school's contention that the plaintiff had left out several important variables that would explain the disparity in salary which the plaintiffs' experts had attributed to gender discrimination. *Id.* at 34. The court found that the university had simply criticized the plaintiff's failure to include certain variables, without offering any reason for concluding that they correlated with sex and affected the result. *Id.* The Second Circuit then held that *Bazemore* requires that a defendant challenging the validity of a multiple regression analysis show that the factors it contends should have been included would weaken the salary disparity demonstrated by the plaintiff's analysis. *Id.*

In *Palmer v. Shultz,* 815 F.2d 84 (D.C. Cir.1987), the District of Columbia Circuit found that *Bazemore* meant that a defendant could not rebut statistical evidence "without introducing evidence to support the contention that the missing factor can explain the disparities as a product of a legitimate, nondiscriminatory selection criterion." *Id.* at 101. *See also Catlett v. Missouri Highway and Transp. Comm'n,* 828 F.2d 1260 (8th Cir.1987), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1574, 99 L.Ed.2d 889 (1988) (defendant bore the burden of showing that plaintiff's failure to include a factor in a multiple regression analysis was significant).

The Third Circuit has been cautious in relying on statistical evidence in the discrimination context. In *Mazus v. Department of Transp.,* 629 F.2d 870, 875, (3d Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981), the court noted that statistical comparisons, to be valuable, "must be free from variables which would undermine the reasonableness of the discrimination inferences to be drawn. Such evidence must be critically examined and all facts and circumstances must be considered." In *Bryant v. International Schools Servs., Inc.,* 675 F.2d 562, 573 (3d Cir.1982), the court observed that "the story statistics tell depends ... upon the eye and ear of the beholder, and ... we must apply a critical and cautious ear to a one dimensional statistical presentation." *See also United States v. Lansdowne Swim Club,* 713 F.Supp. 785, 809 (E.D.Pa.1989), *aff'd,* 894 F.2d 83 (3d Cir. 1990) (excluding statistical evidence because sample size used for chi square analysis was too small); *Shipley v. First Federal Savings & Loan Ass'n of Delaware,* 703 F.Supp. 1122 (D.Del.1988), *aff'd,* 877 F.2d 57 (3d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 3218, 110 L.Ed.2d 666 (1990) (plaintiff failed to establish a prima facie case of discrimination under 42 U.S.C. § 1982 because statistical study was flawed by small sample size and presented an essentially meaningless comparison; summary judgment granted for defendant).

■ While IBM asserts that Churchill's statistics are flawed, it has not produced its own statistical study to support its contentions. Because, on a summary judgment motion, this Court must resolve all doubts in favor of plaintiff, the Court cannot say that plaintiff has failed to establish a prima facie case.

3. Defendant's Affirmative Defenses

■ A defendant may succeed on a summary judgment motion in two ways: by defeating the plaintiff's prima facie case, or by showing that the plaintiff cannot produce sufficient evidence of pretext to rebut an assertion of nondiscriminatory reasons for the discharge. *Jalil v. Avdel*

*Corp.,* 873 F.2d 701, 707 (3d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). Assuming that plaintiff has established a prima facie case of discrimination, the burden of production shifts to IBM to establish that the salary disparity results from one of the four defenses under the Equal Pay Act. IBM has presented a detailed explanation of its pay system, which operates both as a merit system and a seniority system. *See Derouin v. Louis Allis Division,* 618 F.Supp. 221 (D.Wis.1985) (summary judgment granted for defendant where it had shown that any pay disparity base don sex was due to the operation of a legitimate merit and seniority compensation policy). The system operates on a highly individualized basis, with every employee receiving a salary increase at regular intervals based on her performance rating and job level. The performance rating and job level affect the amount of the pay *increase* and are not applied so that all employees at a certain job level and performance standard receive the same salary. Thus, an employee's prior salary history, the number and amount of previous pay increases, has a significant impact on salary.

IBM claims that any pay disparity shown in Dr. England's study could be explained by operation of the merit pay system. IBM contends that if variables such as time in job level and prior salary history were considered by plaintiff's multiple regression analysis, no discrepancy based on sex would be evident. However, as discussed above, cases such as *General Telephone, Sobel* and *Palmer* counsel that a defendant must do more than merely complain that relevant variables were omitted from plaintiff's statistical studies. In addition, these cases dealt with evidence actually submitted at trial. A defendant moving for summary judgment bears an even greater burden to produce some evidence that inclusion of relevant variables would change plaintiff's statistical results. IBM has not submitted any statistics of its own to challenge plaintiff's expert report.

In response to criticism by the defendant, plaintiff included the factor of time in job level in her multiple regression analysis.

Even when she considered this factor, plaintiff still found a $200 monthly pay disparity between male and female technical managers. IBM has not submitted any firm evidence to challenge this conclusion. If IBM had performed its own statistical analysis to rebut plaintiff's claims, this might be a different case.

The Court notes that the Third Circuit has not favored summary judgment in employment discrimination cases. In *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893 (3d Cir.) (en banc), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987), the court held that a plaintiff could offer indirect evidence of pretext by showing that the defendant's explanation of the discrimination was not worthy of belief. In reversing the district court's grant of summary judgment, the court found that the plaintiff's indirect evidence of pretext created a genuine issue of material fact as to the credibility of the employer's legitimate business reasons, foreclosing summary judgment. *Id.* at 901. *See also White v. Westinghouse Elec. Co.,* 862 F.2d 56 (3d Cir.1988) (evidence of pretext created factual issue; reversed lower court's grant of summary judgment on ADEA claim). Summary judgment is inappropriate if the plaintiff establishes a prima facie case and counters the defendant's explanation with evidence raising a factual issue regarding the employer's true motivation. *Jalil,* 873 F.2d at 707.

■ The Court finds that defendant has not met its burden on summary judgment because it failed to establish its affirmative defense under the Equal Pay Act that any disparity could be explained by operation of a merit-seniority compensation system. In addition, plaintiff has presented some evidence that defendant's explanation is merely a pretext for discrimination. Thus, the Court will deny summary judgment on plaintiff's individual pay discrimination claims under the Equal Pay Act and Title VII.

## C. Class Certification

Plaintiff seeks to certify a class consisting of all female technical managers in

NSD and its predecessor organization from August 19, 1985 to the date of judgment pursuant to Title VII and Federal Rule 23(b)(2). Proposed class plaintiffs collectively allege that NSD engaged in a pattern or practice of gender discrimination in salaries in violation of Title VII. Defendant opposes certification because plaintiff has not presented sufficient evidence of the existence of the proposed class to meet the requirements of Federal Rule 23.

In *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), the Supreme Court emphasized that a "Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 161, 102 S.Ct. at 2373. In *Falcon*, the Court reversed the certification of a Title VII class action because plaintiffs failed to fulfill Rule 23's typicality and commonality requirements.[14] In *Falcon*, the Supreme Court "pulled in the reigns" on expansive class actions in employment discrimination cases "by insisting on actual, not presumed, compliance with the typicality and commonality provisions of Rule 23." *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 122 (3d Cir.1985), *aff'd*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987).

Federal Rule 23(a) requires that a plaintiff demonstrate four prerequisites for certification of a class action: (1) members of the class share common questions of law or fact (commonality); (2) the claims or defenses of the representative parties are typical of the class (typicality); (3) the class is so numerous that joinder is impracticable (numerosity); and (4) that the representative will fairly and adequately protect the interests of the parties (adequacy of representation). Fed.R.Civ.P. 23(a). Plaintiffs bear the burden of demonstrating that the requirements of Rule 23(a) have been satisfied.

In *Falcon*, the Supreme Court explained that a "wide gap" exists between an individual's claim of discrimination and the existence of a class of persons who have suffered the same injury as that individual. 457 U.S. at 157–58, 102 S.Ct. at 2371. To bridge this conceptual gap, courts have required that individual plaintiffs establish that there are aggrieved persons in the purported class, primarily through affidavits from employees alleging discrimination, or other evidence establishing the existence of an aggrieved class. *Sheehan v. Purolator, Inc.*, 103 F.R.D. 641, 648 (E.D. N.Y.1984) (citations omitted), *aff'd*, 839 F.2d 99 (2d Cir.), *cert. denied*, 488 U.S. 891, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988). The number of such aggrieved employees must bear some statistically significant relationship to the size of the relevant parts of the employer's work force. *Id.* at 649.

Churchill has submitted five anonymous affidavits alleging sex-based salary discrimination by NSD. The affidavits make vague, general allegations that IBM had discriminated against them with regard to their salaries. None of the affidavits describe any specific facts in support of these allegations. In fact, one affidavit merely claims that the unidentified person who signed it believed that she had suffered discrimination solely on the basis of plaintiff's statistical study. Cert. of Class Member Five. These five affidavits, along with Churchill's claims, were presented to support the existence of a class of 280 aggrieved female technical managers at NSD. The Court finds that this evidence, without more, is completely insufficient to establish the existence of a class, such that the requirements of commonality and typicality are satisfied.

This case is similar to *Sheehan*, in which the district court denied class certification because the plaintiffs failed to demonstrate the existence of a class of aggrieved individuals. Plaintiffs had submitted one affidavit, along with those of the three named

---

**14.** Although the Third Circuit has reported that it has taken an "expansive" view of Rule 23 in Title VII cases, this view "does not obviate the necessity that each requirement of the rule be met." *Green v. USX Corp.*, 843 F.2d 1511 (3d Cir.1988), *vacated on other grounds*, 490 U.S. 1103, 109 S.Ct. 3151, 104 L.Ed.2d 1015 (1989).

plaintiffs, to support certification of a class of 315 employees. *Sheehan*, 103 F.R.D. at 649. The plaintiffs also relied on statistics that 56 other employees had complained of discrimination or harassment by the defendant and on a study comparing the job titles, salaries and fringe benefits received by male and female employees. The court found that these statistics failed to establish the existence of an aggrieved class. *Id.* The court noted that affidavits from individual employees were needed to "flesh out these statistics by particularizing instances where females were discriminated against in favor of males." *Id.* Plaintiff's counsel asserted that the deficiency in affidavits "was due to the fear that employees who submitted affidavits might be submitted to retaliation." *Id.* The court balanced this concern against the policies embodied in *Falcon* and Rule 23(a) and found that it could not certify a Title VII class action without specific proof of a class of persons who suffered the same injury as plaintiffs. *Id.* at 650. The court advised that the "appropriate mechanism to redress the plaintiffs' fear of retaliation is not the certification of class actions on the basis of unsubstantiated class claims, but the statutory protection accorded Title VII claimants under 42 U.S.C. § 2000e–3." *Id.*

Similarly, in *Ross v. Nikko Securities Co. Internat'l, Inc.*, 133 F.R.D. 96 (S.D.N.Y.1990), the court found that the three named plaintiffs had submitted inadequate proof of an aggrieved class of individuals discriminated against on the basis of sex, race and national origin in violation of Title VII. The court explained that plaintiffs'

evidence, consisting of affidavits from three named plaintiffs and one putative class member and statistics comparing male and female employees, was insufficient to "bridge the gap" from their individual claims and putative class claims. *Id.* The court noted that testimonial proof must identify a statistically significant number of aggrieved persons in the putative class in relation to the size of the relevant work force. *Id.* at 97. The court found four affidavits an inadequate basis for certifying a class of 200 individuals. *Id.* The court further observed that deposition testimony by defendant's employees, allegedly admitting discrimination, failed to demonstrate that a significant number of other employees at Nikko felt aggrieved. *Id.* See also *Price v. Cannon Mills*, 113 F.R.D. 66 (M.D.N.C.1986) (statistical studies and general allegations of discrimination were clearly an insufficient factual showing to demonstrate the existence of a class; certification denied).

■■■ As in *Sheehan*, Churchill's statistical study demonstrates merely that an *average* pay disparity exists between male and female technical managers. While this may be some evidence of a pattern or practice of discrimination, it does not mean that every member of the class has a discrimination claim against the defendant. Even if this case is considered to be a "disparate impact" case, an aggrieved class of individuals willing to join this law suit must exist in order for this Court to certify it as a class action.[15] Plaintiff, despite sending two letters to every member of the class,[16]

---

**15.** This Court has its doubts about plaintiff's ability to state a "disparate impact" claim in light of the standards established in *Wards Cove*. In that case, the Supreme Court clarified the burdens on a plaintiff in proceeding on a disparate impact theory. A plaintiff must demonstrate that the application of "a specific or particular employment practice has created the disparate impact under attack." *Wards Cove*, 490 U.S. at 657, 109 S.Ct. at 2124. Applying this analysis, it is insufficient for Churchill to merely complain that a gender disparity in salary exists at IBM. Rather, she must show that this disparity is caused by a specific practice in IBM's compensation system. For example, the use of prior salary history in determining the amount of pay increases might contribute to the

disproportionate impact. In *Wards Cove*, the Court remanded the case and instructed the lower courts to require, as part of plaintiff's prima facie case, a demonstration that specific elements of the hiring process had a significantly disparate impact. 490 U.S. at 657–59, 109 S.Ct. at 2125. Similarly, in this case, plaintiff must identify and show the specific elements of the compensation determination process that have a disparate impact on female technical managers.

**16.** Plaintiff's counsel stated at oral argument that many letters were returned to her because she did not have correct addresses for some class members. Counsel admitted that at least 67 letters reached potential class members.

has only produced five people who might join this law suit. As in *Chaffin v. Rheem Mfg. Co.*, 904 F.2d 1269, 1276 (8th Cir. 1990),[17] Churchill's statistics do not demonstrate the existence of a class of individuals with similar grievances. The only evidence of the possibility of 280 individual grievances are the six affidavits. No other individual has come forward seeking intervention in this lawsuit.

■ In addition, salary decisions at IBM are made on a highly individualized basis, similar to hiring and promotion decisions. This is not a case where salaries for particular positions are made under a single common plan, in which class certification would be more appropriate. *See American Fed. of State, County and Municipal Employees (AFSCME) v. Nassau County*, 664 F.Supp. 64 (E.D.N.Y.1987). The Court thus finds that Churchill has not established the existence of an aggrieved class necessary to satisfy Rule 23(a)'s commonality and typicality requirements and the Court will deny her motion for class certification.

### D. *Discrimination in Promotion*

Churchill also asserts that she was denied a promotion to an executive position at IBM solely because of her sex in violation of Title VII. She submits the following evidence to support her claim: (1) her allegation that Thomas Vassiliades, an IBM vice-president, told Churchill that IBM would not appoint a women to one of the executive positions that Churchill hoped to fill; (2) that eleven director positions became open between November 1986 and July 1987, all of these positions were filled by men and Churchill was more qualified for five of these positions than the men who were promoted; (3) prior to August 1987, only one women had been promoted to an executive position at NSD; (4) that three women filled the top 80 positions at NSD in 1987 and; (5) a report by IBM's Director of Equal Opportunity and Affirmative Action Programs has acknowledged

that the number of women in senior and middle management was "below utilization" but the trend had been upward for the last four years. Cert. of Defendant's Counsel, Ex. I at 6.

■ In order to state a prima facie case of sex discrimination in promotion, a plaintiff must show the following by a preponderance of the evidence: (1) the plaintiff is within a class protected by Title VII; (2) she applied for and was qualified for the position for which the employer was seeking a replacement; (3) despite her qualifications she was rejected; and (4) after her rejection, the position was filled by a person not within the protected class. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 792, 93 S.Ct. at 1824; *Robinson v. Lehman*, 771 F.2d 772, 777 (3d Cir.1985). The Court finds that Churchill has presented sufficient evidence to establish a prima facie case. Indisputably, Churchill is within a protected class. Churchill has also presented evidence that she was qualified for some of the positions available, not only by demonstrating her experience, but also by revealing that her name was on the executive resource tables used to find qualified candidates to fill three of the challenged positions. Churchill was not promoted to the executive positions in question and these positions were filled by men.

Defendant contends that Churchill was not qualified for promotion to the executive level because she had only been with the company ten years. On the average, it takes about 16 years for an employee to reach the executive level. However, Churchill has given examples of several exceptional employees who reached the executive level at NSD in fewer than 16 years. Churchill's glowing performance evaluations indicated that IBM viewed her as an outstanding employee with executive potential.

Once the plaintiff has demonstrated a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employee's re-

---

**17.** The court determined that plaintiff's statistics did not reveal the existence of a class with similar grievances under either disparate treat-

ment or disparate impact analysis. *Chaffin*, 904 F.2d at 1276.

jection. *Id.* This burden is one of production and the burden of persuasion remains at all times with the plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *Robinson,* 771 F.2d at 777. Defendant has presented certifications from the managers who made the promotion decisions of the five men who Churchill claims were less qualified than her. *See* Cert. of Seitz, Beckwith and Schroder. These certifications explain the legitimate reasons for the promotion of these men instead of Churchill which had nothing to do with gender. For instance, several of the men had been with the company far longer than Churchill and had much greater relevant business experience.

■■■■ After the defendant has stated such an explanation, the plaintiff must demonstrate that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. This final step may be satisfied "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095 (citation omitted). In *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989), the Court stated that pretext may be shown in different ways, including a demonstration that the plaintiff was more qualified than the person chosen for the position or a showing of the defendant's past treatment of plaintiff.

Churchill has produced some evidence that suggests that the reasons given by the managers for the promotions in question may be pretexts for sex discrimination. Although Churchill has not shown that she was more qualified than the men promoted to the executive level, Churchill has demonstrated that three of the men promoted were not listed on the executive resource tables for these positions. Churchill was included on the executive resource tables for these positions, along with other candidates. IBM uses executive resource tables as a major source for selecting appropriate candidates for promotion to an executive position. However, candidates are also frequently chosen from executive resource tables for comparable positions in other areas and from other positions within the company.

Since this is a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and must indulge all reasonable inferences in favor of that party. *Hersch v. Allen Products Co.,* 789 F.2d 230, 232 (3d Cir.1986). While hardly conclusive as to pretext, plaintiff's evidence that the men promoted to the executive level were not listed on executive resource tables at least raises the possibility that the business reasons given by the company for the promotion of these men were pretexts for discrimination. *See Rossy v. Roche Products, Inc.,* 880 F.2d 621, 625–26 (1st Cir.1989) (changes in job title and description were sufficient to create factual issue about pretext); *Seitz v. Peat Marwick Main & Co.,* 704 F.Supp. 157, 161 (N.D.Ill.1989) (plaintiff created factual dispute about reasons for her rejection for partnership by her own testimony). Therefore, the Court must deny summary judgment in favor of IBM on plaintiff's promotion claim.

### E. *Constructive Discharge Claim*

■■■■ Churchill also claims that she was constructively discharged from her position in violation of Title VII. She contends that acts of sex discrimination made her working conditions so intolerable that she was forced to resign. IBM argues that plaintiff cannot establish a prima facie case of constructive discharge.

As the Third Circuit explained in *Goss v. Exxon Office Systems Co.,* 747 F.2d 885 (3d Cir.1984), the courts of appeals have developed two basic standards for determining constructive discharge. The subjective standard requires a finding that the alleged discrimination amounts to an intentional course of conduct calculated to force the victim's resignation. *See Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). The

objective standard, by contrast, requires no more than a finding that discriminatory conduct would have the foreseeable result of creating working conditions so unpleasant or difficult that a reasonable person in the employee's position would resign. The Third Circuit has adopted the objective standard, holding that no showing of a specific intent by the employer is necessary for application of the constructive discharge doctrine. *Schafer v. Board of Public Educ.*, 903 F.2d 243, 249 (3d Cir.1990); *Goss*, 747 F.2d at 888. Unlike other courts of appeals, the Third Circuit has held that a plaintiff need not show aggravating circumstances, in addition to discrimination, in order to find a constructive discharge. *Schafer*, 903 F.2d at 250.[18]

Churchill argues that her demotion in position and the manner in which the "Open Door" grievance procedure was handled compelled her to resign. Specifically, Churchill asserts that John Gorman, after being appointed as her immediate supervisor, humiliated her when he eliminated her position in the company and assigned her to a level 60 position, when he informed her subordinates of the reorganization prior to notifying her, and when his failure to circulate a formal announcement letter created the impression that Churchill was demoted for poor performance.

Churchill also claims that the "Open Door" grievance proceeding, in which she filed complaints of sex discrimination against IBM, was conducted in an inappropriate manner. For example, Barbara Wood, who was assigned to investigate Churchill's grievance, was the corporate director of equal opportunity, and may have had an interest in the outcome of the investigation. Churchill asserts that Wood made derogatory comments about some of her complaints. Furthermore, Churchill states that the confidentiality of the Open Door investigation was breached because an IBM official told Churchill's secretary that someone in her position should not

have filed such a grievance. Wood also denied Churchill's request for a transfer or leave of absence during the investigation.

Churchill's allegations indicate that her reassignment and grievance investigation may have been handled insensitively. Viewed in the light most favorable to the plaintiff, however, her statements do not demonstrate that IBM engaged in sex-based discrimination. With regard to her demotion, such temporary restructuring and reassignment of employees occurs frequently at IBM and other large corporations. Churchill asserted in her letter to an IBM executive that she was one of "approximately 85% of software service headquarters middle managers ... [who] are either level protected, have a nonexistent title or have confounded jobs, titles and responsibilities." Cert. of Defendant's Counsel, Ex. G. Churchill was assured that her reassignment would be temporary and that she would eventually be restored to a level 61 position. Furthermore, she was invited to apply for two level 62 director positions at other IBM locations, which she refused because she did not wish to relocate. No one at IBM referred to the restructuring of Churchill's position as a demotion. In her deposition, Churchill admitted that she "couldn't say" whether sex was a factor in her alleged demotion, and she stated that she was willing to return to IBM following a leave of absence if she were given an executive position. Churchill's allegations suggest that Gorman perhaps made an imprudent business decision, but do not suggest that sex discrimination played any role in the reorganization of Churchill's department.

With respect to IBM's conduct of the Open Door investigation, Churchill has also failed to show discrimination based on sex. No evidence links the assignment of an investigator, breach of confidentiality, or negative comments about a high level employee filing such a grievance to Churchill's sex. The fact that the female investigator,

---

**18.** Although it did not impose a formal requirement that the employer have notice of the discrimination for a finding of constructive discharge, the Third Circuit found notice to be a relevant factor for a court to consider. *Leven-*

*dos v. Stern Entertainment, Inc.*, 909 F.2d 747 (3d Cir.1990). Notice to IBM is not a problem in this case since Churchill filed a grievance about the alleged discrimination with the company.

Barbara Wood, made disparaging remarks to Churchill about some of her complaints does not, in itself, suggest sex discrimination.

Churchill's case differs markedly from other Third Circuit cases finding liability based on constructive discharge claims. In all of the major cases, some direct evidence that the employee's sex played a role in the employer's decisions was presented to the court. In *Goss*, for instance, a female sales representative was verbally abused about her decision to become pregnant and her supervisor assigned her lucrative sales territory to a male representative, reducing her pay, despite the plaintiff's successful performance. 747 F.2d at 888. Plaintiff's attempts to pursue in-house remedies resulted in an ultimatum from her employer that she either accept the new assignment or resign. *Id.* In *Levendos v. Stern Entertainment, Inc.*, 860 F.2d 1227 (3d Cir. 1988), a female restaurant maitre'd brought a sex discrimination action against her employer. She was the only female in management and she was excluded from management meetings, although males who were maitre'd's were included. She was denied authority to order supplies, although a male was able to do so. In addition, she was falsely accused of stealing and drinking on the job, and there were rumors and remarks that she was to be replaced by a male. Her employer refused to discuss these problems with her and wine bottles were allegedly placed in her locker to imply that she had stolen them. The court found that these facts raised a genuine issue of material fact regarding whether the plaintiff was constructively discharged. *Id.* at 1233.

Churchill's constructive discharge claims are similar to those in *Cherchi v. Mobil Oil Corp.*, 693 F.Supp. 156 (D.N.J.), *aff'd*, 865 F.2d 249 (3d Cir.1988). In *Cherchi*, the plaintiff claimed that he was constructively discharged in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, when Mobil eliminated his managerial position and offered him a reassignment at another location in a different state. Cherchi refused to accept the reassignment because he believed that the new position was a lesser position and various personal reasons made him unwilling to move. The court found that the plaintiff could not establish a prima facie case and granted summary judgment for the defendant. In evaluating the plaintiff's case, the court observed that a reduction of an employee's duties does not create the intolerable conditions which must be present to establish constructive discharge. 693 F.Supp. at 162. *See Pena v. Brattleboro Retreat*, 702 F.2d 322 (2d Cir.1983) (change in responsibilities without pay reduction could not constitute constructive discharge); *Frazer v. KFC National Management Co.*, 491 F.Supp. 1099 (M.D.Ga.1980), *aff'd*, 636 F.2d 313 (5th Cir.1981) (plaintiff who refused to accept a lower level job without loss of pay or benefits could not establish constructive discharge); *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir.1977) (loss of prestige or supervisory duties insufficient to support finding of constructive discharge). Thus, in this case, the fact that Churchill would have fewer managerial duties in her new position is insufficient, without more, to constitute constructive discharge.

In addition, in *Cherchi*, the court found that the requirement that the plaintiff relocate did not establish a constructive discharge. 693 F.Supp. at 163. The court noted that the plaintiff had worked at other company locations in the past and this supported its conclusion that relocation was not such an intolerable condition for the plaintiff. *Id.* Similarly, Churchill had worked at seven different IBM locations during her ten years with the company. Although she had recently expressed a desire to remain at her current job location, in light of the frequency with which employees are transferred within large multinational corporations, the Court cannot say that offering Churchill positions at other IBM locations was such an intolerable condition that she was constructively discharged.

Furthermore, Churchill was offered a choice in her reassignment. She could either remain at the Franklin Lakes location and occupy a level 60 position or she could

apply for two director positions at IBM offices in Boston or Philadelphia. The Court believes that a reasonable person would not find these reassignments so intolerable as to constitute a constructive discharge.

■ Finally, Churchill's claims that IBM "retaliated" against her because she filed an "Open Door" charge have little merit. The only evidence that Churchill has presented of such retaliation is: (1) an alleged statement to her secretary from an IBM employee that a high-level manager such as Churchill should not have filed a grievance, (2) comments by the "Open Door" investigator, and (3) assignment to a task force requiring significant overtime work. These few isolated statements, in light of the serious, time-consuming investigation of Churchill's complaint, which produced both written and oral reports, can hardly be characterized as intolerable. *See McWilliams v. Western Pennsylvania Hosp.*, 717 F.Supp. 351 (W.D.Pa.1989) (allegedly derogatory utterance and question, along with other harassment, insufficient to create a prima facie case of discriminatory constructive discharge). Also, Churchill had frequently taken on task force assignments in the past and had worked long hours. She obviously did not find such conditions unbearable. The Court finds that IBM's handling of Churchill's grievance did not create conditions so intolerable that they would have led a reasonable person to resign.

Based on these facts, plaintiff cannot establish a prima facie case that the working conditions at IBM were so intolerable that a reasonable person would have resigned. Thus, summary judgment will be granted in favor of IBM on Churchill's constructive discharge claim.

### III. CONCLUSION

For the reasons expressed in this Opinion, the Court will deny plaintiff's motion for class certification. It also will grant summary judgment in favor of defendant on plaintiff's constructive discharge claim. However, the Court will deny defendant's motion for summary judgment on plaintiff's individual salary and promotion discrimination claims.